**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:24-cv-02618-NYW

TIMOTHY VALDEZ

      Plaintiff,

v.

UBER TECHNOLOGIES, INC. [d/b/a "Uber"];
NEUTRON HOLDINGS, INC. [d/b/a "Lime"];
SOCIAL BICYCLES, INC.; SOCIAL
BICYCLES HOLDINGS INC.; and SOCIAL
BICYCLES LLC [each d/b/a "JUMP"]; and
ZHEJIANG OKAI VEHICLE CO. LTD.; and
OKAI, INC. [each d/b/a "OKAI"]

      Defendants.

---

**Timothy Valdez's Response to Lime's Motion to Compel Arbitration (Doc. 15)**

---

Plaintiff Timothy ("Tim") Valdez objects to Lime's Motion to Compel Arbitration (Doc. 15) for multiple reasons. Most importantly, Lime's app login process doesn't work like Lime claims it does; Lime never presented Valdez with a prompt to "click to agree." Valdez attaches video evidence to prove it. Beyond that, Lime's alleged contracts to arbitrate were illusory, invalid by conflict with Lime's license agreement with the City and County of Denver, and waived by both later affirmation of an earlier contract and failure to comply with the self-imposed arbitration demand deadline in that contract. Valdez explains each of these arguments in the following Response:

## I.     FACTS

**A. Lime's Agreement with Valdez:**

### 1. "Clickwrap" is not the same as "browsewrap" in online contracts.

"A 'clickwrap' or 'click-through' agreement usually 'appears on an internet webpage and requires that a user consent to any terms or conditions by clicking on a dialog box on the screen in order to proceed with the internet transaction.'" [1], [2] "To form a clickwrap agreement, users typically click an 'I agree' box after being presented with the opportunity to view the terms and conditions of use. ... The assent process in a clickwrap agreement is made when a user clicks 'I agree,' but the user may not necessarily view the contract, or terms of use, to which the user is assenting." *Id.*

A "browsewrap" agreement is different and provides far less in the way of unambiguous evidence of assent. In a browsewrap model of contract offer, "the user is not required to take any action to indicate agreement to the terms," making them "rarely enforced." *Id.* (Ironclad) at 7.

### 2. Lime falsely claims clickwrap; Lime used less than browsewrap.

The Declaration[3] attached to Lime's Motion is not an accurate statement of how Lime's sign-up process worked when Valdez first logged in.[4] When Valdez first logged into the Lime app, he was never asked to click or confirm anything, nor was he given any

---

[1] 150 Am. Jur. Trials 383 (Originally published in 2017) (footnotes omitted).

[2] *See also*, Ironclad's "Clickwrap Litigation Trends" (2023), available online at https://ironcladapp.com/lp/clickwrap-litigation-trends/ and attached as **Exhibit 1**, p. 5

[3] Doc. 15-1.

[4] **Exhibit 2**, Aff. of Timothy Valdez; **Exhibit 3**, Download Source of 2020 Lime app; **Exhibit 4**, Video of Sign-up test of Lime App; **Exhibit 5**, Video of Scooter Rental App Test; all attached.

link or other notice that he was being asked to agree to the claimed User Agreement.[5]
Unlike Lime, Valdez has attached a video proving his contention. Screenshots aren't good
evidence of how an interactive application works, but the following screenshots from
Exhibit 4 at least illustrate the process shown in the video:



At least by logging in the way Valdez did in 2020, <u>the clickwrap screen claimed by Lime
at Doc. 15-5 was never presented to Valdez</u>. *Id.*

      Lime's Declaration goes on to claim that Valdez "affirmatively assented" to a later
version of the purported User Agreement when he started a ride on March 30, 2021. This
claim is supported by even less evidence and is likewise inaccurate. Again, a video of a
test shows that nothing in the process of renting a scooter triggers a clickwrap screen.[6]

      Lime's app didn't even include any "browsewrap" that might have given someone
like Valdez notice of an offer to enter into the User Agreement. The app's main map
screen includes no such thing, and the "hamburger" menu at the top-left opens to yield

---

[5] Exs. 2, 4.
[6] Exs. 2, 5; *see also* **Exhibit 6**, Valdez Ride Receipt, attached.

nothing more.[7] Even in the current version of Lime's app (which Valdez has never used), the only existing browsewrap is expressly limited to "New riders," not people like Valdez who signed up using a prior version of the app.[8]

Maybe Lime's app works differently in certain login conditions—like when someone uses their email address or Facebook credentials to log in. But that isn't what Valdez did; he used his phone number alone.[9] And with no affirmative assent required or notice presented to him through this login method, he was not aware that he was entering into any linked agreement. *Id.*, para. 15. Rather, he thought he was engaging in a simple rental transaction, and nothing more. *Id.*

### 3. The User Agreement claims an unfettered right to change its terms.

Even if Valdez had assented to the claimed User Agreement through a true clickwrap function, as Lime alleges, both claimed versions of the Agreement include an important self-serving term. Under both versions, Lime claims an unfettered right to "amend these Terms from time to time, [with] the revised version [becoming] effective when posted on [Lime's] website."[10] In other words, amended terms may not be (and in fact <u>are</u> not) available on the app Lime renters actually use—just on the separate website.

### 4. The User Agreement imposes a deadline to demand arbitration.

Had Valdez assented to the User Agreement, that Agreement also includes a deadline to initiate arbitration. The claimed Agreement says, "[i]f either of us wish to

---

[7] **Exhibit 7**, Current and Past Version Menu Screenshots, attached.
[8] **Exhibit 8**, Screenshots of Today's Lime Login Screen, attached, and not applicable to Valdez's transaction. Notably, the app's login process still doesn't present any clickwrap.
[9] Ex. 2, para. 9.
[10] Doc. 15-2; Doc. 15-3.

initiate arbitration, the initiating party must notify the other party in writing via certified mail, return receipt requested, or hand delivery within the applicable statute of limitations period." Lime's post-injury actions will become relevant here.

## B. Lime's Agreement with the City of Denver:

### 1. To get Denver's permission to operate, Lime accepted a license agreement that was intended to benefit end users like Valdez.

Two months after Lime claims to have unilaterally updated its User Agreement, it entered into a contract with the City and County of Denver that conflicts in many ways with what Lime claims to be the applicable User Agreement.[11] This License Agreement was formed for one express purpose: "[t]he City and Lime now wish to provide for the use of [its scooters, bicycles, and associated property] by End Users within the geographical boundaries of the City and County of Denver as part of a citywide micromobility program…"[12] This License Agreement is the sole basis by which Lime is allowed to store its property on and offer it for rent from the City and County's right-of-way. *Id.*

The license governs all aspects of the operation of Lime's business in Denver, from vehicle safety, to End User privacy, to protection of pedestrians, and more.

### 2. Lime's license agreement chooses District Court for the City and County of Denver as the venue for all actions under the agreement.

Lime's Denver License Agreement does not mention arbitration, much less approve of mandatory pre-dispute arbitration with End Users like Valdez. Rather, the

---

[11] **Exhibit 9**, Denver License Agreement; **Exhibit 10**, Denver Signature Resolution date April-May, 2021; both attached.
[12] Ex. 9, p. 1.

License Agreement states that "[v]enue for any action under this License shall be in the District Court for the City and County of Denver." *Id.* at 10, para. 14.

**3. Lime's license agreement requires advance notice to End Users of all updates to Lime's terms of service, to be published on its website <u>and app</u>.**

Lime's Denver License Agreement also contains requirements relevant to notice of updated terms of service. Specifically, it requires that Lime "provide all End Users with advance notice of updates to its terms of service … published on Lime's website <u>and app</u>." *Id.* at 24, para. L.9. (emphasis added).

**4. Lime has not complied with its license agreement with Denver.**

Lime has not complied with its Denver License Agreement in at least two ways: venue and advance notice of terms. Evidence of the former is in the record of this Court. Lime removed the case from its correct, agreed-upon venue, and now seeks to change venue again—to a private arbitration. Evidence of the latter is in Exhibits 7 and 8, *supra*. Even today, the only reference to a user agreement is on the sign-up screen and expressly applicable only to "<u>new</u> users." This implies that the terms for existing users have not changed, even though Lime now claims they have. Once logged in, there is nothing in the app that references the claimed User Agreement, much less advance notice of upcoming changes.

**C. Lime's Recent Waivers and Admissions:**

**1. Lime has reaffirmed that the 2019 User Agreement is the only one it seeks to apply to this dispute.**

Even Lime's counsel were not aware of its purported 2021 User Agreement update before filing the present Motion. As part of the parties' pre-litigation investigation, the

undersigned performed an inspection of the scooter Valdez was riding when he was injured. At the inspection, Lime's counsel referenced a user agreement, so the undersigned asked Lime's counsel to send whatever Lime was claiming Valdez had agreed to. Lime's counsel sent only the claimed 2019 User Agreement, not the 2021 update.[13]

### 2. Lime missed its self-imposed deadline to demand arbitration.

On August 12, 2022, Tim Valdez left a bar and felt like he would be able to safely ride home on the Lime scooter that was placed for rent just outside the bar's front door.[14] He hit a small pothole he couldn't see in the dark, which caused the scooter to shimmy uncontrollably. He fell, hit a car and suffered a cervical spine injury that rendered him almost completely quadriplegic. His claims have always been based on a theory of strict product liability, so his statute of limitations period expired on August 12, 2024. Lime did not demand arbitration until September 30th.

## II.    LAW

### A. The existence of an agreement to arbitrate (including arbitrability) is an issue for the Court.

Lime misconstrues the law as allowing the arbitrator to decide arbitrability even where there was no acceptance of the agreement to arbitrate in the first place. "'Unless the parties clearly and unmistakably provide otherwise, the question of whether the

---

[13] **Exhibit 11**, Emails re: Purported User Agreement.
[14] *See generally* Doc. 1-4, First Am. Complt.

parties agreed to arbitrate is to be decided by the court, not the arbitrator.'"[15] "[T]he FAA does not authorize federal courts 'to favor arbitration over litigation'; it makes 'arbitration agreements as enforceable as other contracts, but not more so.'"[16] "'[T]he FAA's pro-arbitration purpose cannot override the original meaning of the statute's text.'"[17]

"If ... the parties did not agree to submit the arbitrability question itself to arbitration, then the court should decide that question just as it would decide any other question that the parties did not submit to arbitration, namely, independently. ... [A]rbitration is simply a matter of contract between the parties; it is a way to resolve those disputes—but only those disputes—that the parties have agreed to submit to arbitration."[18] "Courts should not assume that the parties agreed to arbitrate arbitrability unless there is 'clea[r] and unmistakabl[e]' evidence that they did so." *Id.* at 944. "In this manner the law treats silence or ambiguity about the question 'who (primarily) should decide arbitrability' differently from the way it treats silence or ambiguity about the question 'whether a particular merits-related dispute is arbitrable because it is within the scope of a valid arbitration agreement'—for in respect to this latter question the law reverses the presumption." *Id.* at 944-45. Based on this analysis, the Supreme Court held that even a party who actively litigated an arbitrability objection before an arbitration panel did not waive his right to have a court review the arbitrability decision independently. Id. at 946-47.

---

[15] *In re Cox Enterprises, Inc. Set-top Cable TV Box Antitrust Litig.*, 835 F.3d 1195, 1201 (10th Cir. 2016) (quoting *AT & T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986)).
[16] *Brock v. Flowers Foods, Inc.*, --- F.4th ----, No. 23-1182, 2024 WL 4744443, at *4 (10th Cir. Nov. 12, 2024) (quoting *Morgan v. Sundance, Inc.*, 596 U.S. 411, 418 (2022)).
[17] *Id.* (quoting *Waithaka v. Amazon.com, Inc.*, 966 F.3d 10, 24 (1st Cir. 2020)).
[18] *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943 (1995) (citations omitted).

This Court has previously reached the same conclusion: "[w]hether a valid arbitration agreement exists is a threshold determination 'presumptively for courts to decide.'"[19]

## B. When ruling on the existence of an agreement to arbitrate, the Court should apply a standard akin to that applicable to a motion for summary judgment.

Lime's Motion fails to disclose its substantial burden of proof. In addition to the above, this Court's ruling in *Parker Nursing* held that "'[w]hen the parties dispute whether an arbitration agreement exists, the party moving to compel arbitration bears a burden similar to the one a summary judgment movant faces—it must make an initial showing that a valid arbitration agreement exists.'"[20] "'[T]he party moving to compel arbitration bears the initial burden of presenting evidence sufficient to demonstrate the existence of an enforceable agreement.'"[21]

"'If the moving party carries this burden, the burden shifts to the non-moving party to show a genuine issue of material of fact about the formation of the agreement to arbitrate.'" *Id.* (quoting *Hutton, supra.*). "If genuine disputes of material fact exist, the FAA 'calls for a summary trial.'" *Id.* (quoting *Bellman, supra.*) "But if there are no material disputes of fact, the court may 'resolve the arbitration question by ruling on a motion to compel, rather than conducting a summary trial.'" *Id.*

---

[19] *Parker Nursing and Rehab Ctr., LLC v. Kebre*, No. 23-CV-01595-NYW-JPO, 2024 WL 3567320, at *2 (D. Colo. July 29, 2024) (quoting *Oxford Health Plans LLC v. Sutter*, 569 U.S. 564, 569 n.2 (2013)).
[20] *Id.* (quoting *Hutton & Hutton L. Firm, LLC v. Girardi & Keese*, 96 F. Supp. 3d 1208, 1228 (D. Kan. 2015) (itself citing *Hancock v. Am. Tel. & Tel. Co., Inc.*, 701 F.3d 1248, 1261 (10th Cir. 2012))).
[21] *Id.* (quoting *Bellman v. i3Carbon, LLC*, 563 F. App'x 608, 612 (10th Cir. 2014)).

**C. The Court should apply state law contract principles in deciding whether the parties reached a valid agreement to arbitrate.**

Lime next misconstrues the law as allowing the FAA, rather than state law, to govern the Court's arbitrability analysis. But "the FAA's 'policy favoring arbitration' does not authorize federal courts to invent special, arbitration-preferring procedural rules."[22] "Accordingly, a court must hold a party to its arbitration contract just as the court would to any other kind. But a court may not devise novel rules to favor arbitration over litigation." *Id.* For example, as relevant to the dispute in *Morgan*, "the Eighth Circuit was wrong to condition a waiver of the right to arbitrate on a showing of prejudice." *Id.* at 417.

The correct rule is this: federal courts must "look to state law principles of contract formation to tell us whether an agreement to arbitrate has been reached."[23]

**D. Where there is no conflict of law, the forum state's law applies.**

Lime raises a possible choice-of-law issue without much analysis. Valdez agrees that not much might be needed. "'If there is no [outcome determinative] conflict [of state laws], there is no choice of law issue, and the forum state's law applies.'"[24]

**E. In California and Colorado, "browsewrap" agreements fail for lack of assent.**

In Colorado, "[a] party's 'assent [to a contract] may be implied from the totality of circumstances and the acts of the parties.'"[25] "When evaluating assent in the context of

---

[22] *Morgan v. Sundance, Inc.*, 596 U.S. 411, 418 (2022).

[23] *Avedon Engr., Inc. v. Seatex*, 126 F.3d 1279, 1287 (10th Cir. 1997) (citations omitted).

[24] *Richardson v. Allstate Fire and Cas. Ins. Co.*, 637 F. Supp. 3d 1186, 1190 (D. Colo. 2022) (quoting *SELCO Community Credit Union v. Noodles & Co.*, 267 F. Supp. 3d 1288 (D. Colo. 2017)).

[25] *Macasero v. ENT Credit Union*, 533 P.3d 982, 988 (Colo. App. 2023) (quoting *Vernon v. Qwest Commc'ns Int'l, Inc.*, 857 F. Supp. 2d 1135, 1149 (D. Colo. 2012) (published order) (applying Colorado law), *aff'd*, 925 F. Supp. 2d 1185 (D. Colo. 2013)).

email and the internet, 'the threshold issue is ... did the consumer have reasonable notice, either actual or constructive, of the terms of the putative agreement and did the consumer manifest assent to those terms.'" *Id*. More specifically, "the court assesses 'whether the contractual terms were 'reasonably conspicuous' and whether [the] alleged assent to them was 'unambiguous.''"[26]

While Colorado's Supreme Court hasn't made specific reference to the distinction between different forms of online "-wrap" agreements, California uses the same general definition of assent, and California's case law is well developed on the issue. In California, "'[m]utual manifestation of assent, whether by written or spoken word or by conduct, is the touchstone of contract.'"[27] "Because browsewrap does not require the user to take any unambiguous action to agree to the terms of use, 'courts have reached consistent conclusions when evaluating the enforceability of [these] agreements ..., generally finding ... browsewrap agreements to be unenforceable.'" *Id.*

Federal courts in his District have predicted a similar outcome from Colorado's supreme court. For example, in the *HomeAdvisor* litigation, Judge Brimmer assessed a telephone sign-up process during which consumers were expressly advised about the existence of additional terms and conditions, but not told what they were. *In re*

---

[26] *In re HomeAdvisor, Inc. Litig.*, No. 16-CV-01849-PAB-KLM, 2019 WL 4463890, at *3 (D. Colo. Sept. 17, 2019) (quoting *Grosvenor v. Qwest Corp.*, 854 F. Supp. 2d 1021, 1026 (D. Colo. 2012) (itself citing *Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17 (2nd Cir. 2002) (applying Colorado contract law and noting that Colorado law 'bears some similarity to the California law assessed in *Specht*'))).
[27] *Weeks v. Interactive Life Forms, LLC*, 319 Cal. Rptr. 3d 666, 671 (Cal. App. 2d Dist. 2024) (citations omitted).

*HomeAdvisor*, *supra.* There, Judge Brimmer found insufficient proof of assent and declined to compel arbitration. *Id.*

In both California and Colorado, Courts have given ample guidance to companies like Lime about their ability to choose a reliable method of contract formation. Rather than take the risk of relying on browsewrap to prove assent, companies can always use clickwrap instead; agreements formed this way "have routinely been upheld."[28]

## F. In California and Colorado, a promise is illusory when the drafter has the unfettered right to modify it.

In California, "an unqualified right to modify or terminate the contract is not enforceable."[29] In Colorado, "'an arbitration agreement allowing one party the unfettered right to alter the arbitration agreement's existence or its scope is illusory.'"[30]

## G. In California and Colorado, an intended third-party beneficiary may enforce a contract.

In Colorado, a third-party beneficiary to a contract may sue to enforce it.[31] "Under Colorado law, a third-party beneficiary to a contract is an individual who, despite not being a signatory to the contract, is ' 'intended by the other parties to be a direct beneficiary of

---

[28] *McGuire v. CarMax Bus. Services LLC*, No. 1:23-CV-02938-NYW-SBP, 2024 WL 3897073, at *15 (D. Colo. Aug. 16, 2024) (quoting *Hancock v. Am. Tel. and Tel. Co., Inc.*, 701 F.3d 1248, 1256 (10th Cir. 2012)), report and recommendation adopted, No. 23-CV-02938-NYW-SBP, 2024 WL 4027964 (D. Colo. Sept. 3, 2024).
[29] *Asmus v. P. Bell*, 999 P.2d 71, 79 (Cal. 2000).
[30] *Grosvenor v. Qwest Corp.*, 854 F. Supp. 2d 1021, 1032 (D. Colo. 2012) (quoting *Dumais v. Am. Golf Corp.*, 299 F.3d 1216, 1219 (10th Cir. 2002)).
[31] *Jefferson Cnty. Sch. Dist. No. R-1 v. Shorey*, 826 P.2d 830, 842 (Colo. 1992).

that agreement.'"[32] "'[T]hat intent may be evidenced either from the terms of the agreement, the surrounding circumstances, or both.'"' *Id.*

California's third-party beneficiary doctrine is almost identical.[33]

## H. Waiver is always a defense to an agreement to arbitrate.

Finally, Lime fails to address waiver. Waiver is a defense to a motion to compel arbitration. This is because "[i]t is axiomatic that 'the right to arbitration, like any other contract right, can be waived.'" *In re Cox*, *supra.*, 790 F.3d at 1115.

## III.    ANALYSIS

## A. Valdez never assented to Lime's "User Agreement."

The evidence Lime submits in support of its claim of assent fails on two points. Most importantly, Lime's evidence isn't accurate to the process by which Valdez logged into the Lime app in 2020. Valdez was never provided with a clickwrap contract—not when he first logged in, and never when he started a ride. The claimed User Agreement was not even referenced as browsewrap on the login screen when Valdez first logged in. It was not—and still is not—anywhere in Lime's app after he logged in. This at least entitles Valdez to a summary trial on the issue of arbitration.

But Lime's evidence shouldn't even take it that far. Lime's Declaration expresses some level of access to back-end data allegedly showing assent, but Lime attaches none of that. It instead provides generic screenshots in a vacuum, which don't actually prove

---

[32] *Seen v. TYES, Inc.*, No. 21-CV-01429-RM-STV, 2022 WL 22568665, at *8 (D. Colo. July 14, 2022) (citations omitted), report and rec. adopted *sub nom. Youth Seen v. TYES, Inc.*, No. 21-CV-01429-NYW-STV, 2022 WL 22568654 (D. Colo. Aug. 9, 2022).
[33] *See Goonewardene v. ADP, LLC*, 434 P.3d 124, 126–27 (Cal. 2019).

how the app worked for Valdez. The only logical inference from Lime's failure to attach specific evidence is that Lime has none for Valdez. Lime has therefore failed to carry its burden at the outset, warranting denial.

**B. Even if Valdez had assented, the User Agreement is unenforceable for two reasons:**

**1. The User Agreement is unenforceable because it's illusory.**

Even if Valdez could be shown to have assented, Lime would still need to show that it promised something of substance by promising to arbitrate. It didn't. Instead, it promised that the agreement would always be what Lime decided, as posted to its website and not even in the app Valdez was using. Lime's own Motion makes the point: Lime alleges it unilaterally changed the agreement (including the arbitration provision), and claims Valdez assented simply by renting a scooter—an act that doesn't trigger any notice, much less a clickwrap assent function. This was an illusory promise.

**2. The User Agreement is unenforceable because it violates Lime's more recent license agreement with the City of Denver.**

Ironically, Lime's Motion makes so much of Valdez's alleged failure to comply with a contract he never knew about that it ignores the contract Lime <u>signed</u> only months later. Lime promised in this contract to submit all disputes arising out of its business in Denver to resolution by the District Court for the City and County of Denver. Lime breached that agreement by removing to this Court. Lime is attempting to breach that agreement again with the present Motion. Even if Valdez had assented to prior User Agreements, these would have been reformed by any conflicting provisions in Lime's agreement with the City and County of Denver, which Valdez has the right to enforce as a third-party beneficiary.

**C. Even if there was a valid contractual right to arbitration, Lime waived it twice.**

Lime waived any subsequent modifications to its User Agreement by reaffirming through counsel that the 2019 version still applies. And Lime waived its right to initiate arbitration by missing its "statute of limitations" deadline to do so. Even if all of Valdez's other arguments fail, these final issues would require the denial of Lime's Motion.

## IV.    CONCLUSION

Lest this Response feel like "throwing spaghetti at the wall to see what sticks," Valdez should note the common thread that ties all of these issues together: Lime consistently says one thing and does another. Lime *says* it uses obvious, fair, and forthright clickwrap, but it *implements* something even less obvious than browsewrap. Lime *says* it expects its contracts with its users to be reliable and enforceable; but it *exercises* its right to amend them at will, however and whenever it wants. Lime *says* it will comply with its contract with the City and County of Denver, but what it *does* is pretend that no such contract exists. Lime *says* it will seek to enforce a 2019 User Agreement, then *does* seek to enforce a 2021 version. Lime *says* it will demand arbitration by a determinable deadline, but what it *does* is miss that deadline and demand arbitration regardless. At each turn, there was a more reliable method Lime chose to reject. For this, Lime should be denied what it is requesting.

WHEREFORE, Plaintiff, Timothy Valdez, requests that the Court DENY Lime's Motion to Compel Arbitration (Doc. 15) WITH PREJUDICE or, alternatively, ORDER A HEARING to resolve any disputes of fact, and such other relief as this Court deems proper.

RESPECTFULLY SUBMITTED at Denver, Colorado, November 25, 2024.


DORMER HARPRING, LLC

By:    */s/ Sean Dormer*
       Sean Dormer, #44962
       Timothy M. Garvey, # 42668
       Amy N. Rogers, #49266
       Dormer Harpring, LLC
       3457 Ringsby Court, Unit 110
       Denver, CO 80216
       Telephone: (303) 747-4404
       Email: attorneys@denvertrial.com
       *Attorneys for Plaintiff*


## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on November 25, 2024, a true and correct copy of the foregoing was served on the following, by electronic filing using the CM/ECF filing system which will send a copy to the following email addresses:


Erik D. Nadolink
Anne M. Anderson
nadolink@wtotrial.com
anderson@wtotrial.com
*Attorneys for Defendant Neutron Holdings, Inc. d/b/a Lime*

David B. Seserman
dseserman@sesermanlaw.com
*Attorney for Defendant Okai, Inc. and Zhejiang Okai Vehicle Co. Ltd*

Kimberly L. Koehler
Kim.koehler@wilsonelser.com
*Attorney for Defendant Uber Technologies, Inc.; Social Bicycles, Inc.; Social Bicycles Holdings Inc.; and Social Bicycles LLC*


       */s/ Brittany Freeman*
       Brittany Freeman, Paralegal