
Ironclad

# Clickwrap *Litigation* Trends

**2023 REPORT**



# Table of Contents

**03**   Introduction

**04**   How Online Agreements Perform In Court

**08**   Clickwrap Litigation: Trends by Agreements

**11**   Defending Clickwrap In Court

**13**   Clickwrap Best Practices for 2023

**15**   Clickwrap Best Use Cases

**18**   Conclusion



# Introduction

To safeguard businesses from risk, it is crucial to understand how courts evaluate the enforceability of online agreements. But case law on online agreement formation indicates that many companies struggle with designing online agreements that are enforceable. Legal teams can use the best practices outlined in this Clickwrap Litigation Trends Report, gleaned from hundreds of cases over the past two decades, to educate product or other technical teams on the requirements for creating enforceable online agreements.

Companies across various industries have widely embraced click-to-accept contracts, also known as clickwrap or clickthrough agreements. These agreements provide a hassle-free method for users of websites and mobile apps to accept standardized online terms. The most forward-thinking businesses recognize the importance and effectiveness of frictionless contracting and have incorporated clickwrap contracts into their processes.

Clickwrap agreements are often broken down into three distinct categories of online agreement presentations: clickwrap, sign-in-wrap, and browsewrap. Clickwrap and sign-in-wrap agreements require the user to take some action indicating that they agree to the terms, while browsewrap agreements do not require that the user take any action. These categories are explained further in the next section.

Despite the increased prevalence of click-to-accept agreements, best practices for their use is not widely known. Product and legal teams are left guessing how to present online agreements in an enforceable manner, obtain user consent, and record acceptance. In 2022, online agreements of all types, including clickwrap, sign-in-wrap, and browsewrap, had a 73% success rate of enforcement in court. Clickwraps were by far the most successful agreement type in court with an 87% success rate. Notably, most unenforceable terms failed because of suboptimal screen design. This implies that, while enforceability remains at the discretion of the court, businesses can increase their chances of setting up enforceable online terms by mastering the nuances of optimal clickwrap design.

Our Clickwrap Litigation Trends Report provides an overview of the most recent court assessments of online agreements, including the evidence courts rely on to determine contract enforceability, common trends in various industries, and success rates of different types of online agreements. The report seeks to educate in-house legal teams at software and ecommerce companies, as well as companies in heavily regulated industries that navigate online and digital-first transactions, on the makings of an enforceable online agreement. For reference, the statistics in this report are composed of cases from 2022 cited on Bloomberg Law.

# How Clickwrap, Browsewrap, and Sign-in-Wrap *Perform in Court*

Online agreements can be presented to and entered into by users through a variety of methods, and they are not all created equal under jurisprudence over the years. Courts have a clear preference for clickwrap agreements over both sign-in-wrap and browsewrap agreements.

# Clickwrap

Clickwrap agreements have a high enforceability rate because they require users to take affirmative action to agree to the terms.

Clickwrap agreements require the user to expressly agree to the contract by clicking a button or checkbox that states, "I agree."[1] Clickwrap agreements can be presented to the user in a few different ways. For example, many websites include a hyperlink to the contract in the agreement language located next to the button or checkbox, which takes the user to a separate page that contains the contract.[2] Other websites include the contract in a scrollpane, which the user can scroll through to read prior to clicking "I agree."[3]

For example, in Cheng v. PayPal, Inc., the court held that PayPal created an enforceable agreement by requiring users to check a box next to language stating they have "read and agree to the User Agreement" and then click a button labeled "Agree and Create Account."[4] Similarly, the court in Gatto v. International Vitamin Corp. found that GNC created a binding agreement by requiring customers to check a box next to language stating "I agree to the Terms & Conditions" when creating an online account.[5] The court stated that "the click-wrap format provided Gatto with adequate opportunity to read and review the Terms and Conditions, and Gatto indicated his affirmative assent by clicking on the box; thus, the arbitration agreement is valid."



[1] Hines v. Overstock.com, Inc., 668 F. Supp. 2d 362, 366 (E.D.N.Y. 2009). Similar language like "I accept" is also common and enforceable.
[2] See Loewen v. Lyft Inc.,129 F. Supp. 3d 945, 949 (N.D. Cal. 2015).
[3] See Feldman v. Google, 513 F. Supp. 2d 229, 233 (E.D. Pa. 2007).
[4] Cheng v. PayPal, Inc., No. 21-cv-03608-BLF (N.D. Cal. Jan. 13, 2022).
[5] Gatto v. Int'l Vitamin Corp., No. 8:21-cv-00889-JLS-DFM (C.D. Cal. Dec. 08, 2021).

05

# Sign-in-wrap

Sign-in-wraps are enforced less frequently than clickwrap agreements because the user's acceptance of the terms is not the primary purpose of the action taken by the user to agree to them.

Sign-in-wrap agreements are often referred to as a "hybrid" between clickwrap and browsewrap agreements.[6] Users are not required to affirmatively agree to a contract by clicking a button or checkbox. Instead, sign-in-wrap agreements notify the user of the existence of the contract and advise the user that by clicking the button to proceed to the next screen, the user agrees to the contract.[7] Websites can integrate sign-in-wrap agreements into any action that requires the user to click a button to proceed. Some of the more common actions include logging in, signing up, and registering.[8]

As a result, courts tend to scrutinize sign-in-wrap agreements more closely to determine whether they alert users to the terms. For example, the court declined to enforce Fluent, Inc.'s terms in Berman v. Freedom Financial Network, LLC, because Fluent's sign-in-wrap failed to put users on notice of the terms and their agreement to them.9 However, companies typically have success in creating enforceable agreements if they implement sign-in-wraps with best practices in mind. Fluent's sign-in-wrap agreement language was in a "tiny gray font," and the hyperlinks to the terms did not stand out against the surrounding text in any way.10 By contrast, the court in Shirley v. Rocket Mortgage enforced Rocket Mortgage's sign-in-wrap agreement, reasoning that Rocket Mortgage afforded users with reasonable notice of their agreement to the terms by using clear language at multiple points in the sign-up process and making the links to the terms stand out compared to the rest of the text.[11] The court similarly reasoned in Dobbs v. Health IQ Insurance Services, Inc. that Health IQ's sign-in-wrap, which informed users that "by clicking 'SUBMIT,' you agree to our Privacy Policy and Terms of Use," afforded customers reasonable notice of the terms and an opportunity to affirmatively agree to them by making the hyperlinks stand out against the rest of the text.[12]

[6] *Berkson v. Gogo LLC, 97 F. Supp. 3d 359, 366 (E.D.N.Y. 2015).*
[7] *Id. at 399.*
[8] *Id.*
[9] *Berman v. Freedom Fin. Network, LLC, 30 F.4th 849 (9th Cir. 2022)*
[10] *Id.*
[11] *Shirley v. Rocket Mortg., No. 2:21-cv-13007 (E.D. Mich. July 07, 2022)*
[12] *Dobbs v. Health IQ Ins. Servs., Inc., No. 21-5276 (E.D. Pa. July 27, 2022)*

**Sign Up**

By signing up, you are agreeing to our **Privacy Policy** our **Terms & Conditions**

Full name

Email

Password

Confirm your password

SIGN UP

> By signing up, you are agreeing to our **Privacy Policy** our **Terms & Conditions**

06

# Browsewrap

Because the user is not required to take any action to indicate agreement to the terms, browsewrap agreements are rarely enforced.

Browsewrap agreements do not require the user to affirmatively signify assent to the website's contract terms through clicking a button or checking a box.[13] Rather, users agree to the website terms simply by using the website.[14] Websites that rely on browsewrap agreements typically include a notice and a link to the terms somewhere on the screen (usually the bottom of the screen), which states that by using the website, the user is assenting to the website's terms and conditions.[15]



[13] *Nicosia v. Amazon.com, Inc., 834 F. 3d 220, 233 (2d Cir. 2016).*
[14] *Nguyen v. Barnes & Noble, Inc., 763 F. 3d 1171, 1176 (9th Cir. 2014).*
[15] *Id.*

# Clickwrap Litigation Trends *by Agreement*

The volume of clickwrap-specific litigation is around the highest it's been since it first appeared in court more than twenty years ago. This past year, well-designed clickwrap agreements were enforced, but browsewraps seem to have completely fallen off as a feasible way to present enforceable agreements. Here are some other trends we noticed in 2022.

# Enforceability Rate of Online Agreements

Online agreements, including clickwrap, browsewrap, and sign-in-wrap, have had an overall success rate of 73%.



## Clickwrap

Clickwrap agreements were the most common online agreements used in 2022, and they had the highest success rates of all types of agreements. 62% of online agreements litigated were clickwrap agreements. They were successful 87% of the time, compared to the 75% success rate they had in 2021. As discussed below, the most common reason courts did not enforce clickwrap agreements was because of poor screen design, suggesting that if companies incorporated best practices in design, the enforceability of clickwrap agreements would increase substantially.

## Sign-In-Wrap

Sign-in-wrap agreements, on the other hand, have stayed stagnant and made up only 30% of online-agreement cases in both 2021 and 2022. As noted in the previous section, sign-in-wraps are enforced less frequently than clickwrap agreements, and only 68% of them were enforced in 2022.

## Browsewrap

Browsewrap agreements, unsurprisingly, had a dismal enforceability rate in court last year. Because they do not require affirmative acceptance or put users on notice about the existence of the agreement, browsewrap agreements perform the worst of all online agreement presentations. Only 9% of litigated online agreements were browsewraps in 2022, and none were enforced. By and large, companies are choosing to employ clickwrap agreements as the means for presenting their online terms rather than sign-in-wraps and browsewraps.

Win Rate



CLICKWRAP



SIGN-IN-WRAP



BROWSEWRAP



# What shows up most frequently in court?

## Commonly Litigated Agreements

As in 2022, the contracts at issue in most cases were standard website terms. 65% percent of cases involved "terms of use," "terms of service," or "terms and conditions." Employment agreements followed in a distant second, making up 12% of cases. Other agreements litigated included software agreements, waivers, and borrower agreements.

## Most Common Reasons for Non-Enforcement

The most common reason a company's online terms weren't enforced in 2022 was because of poor screen design. Courts are often specific about what they consider reasonable and conspicuous notice, and many websites use deficient screen design that fails to meet the set standards. Poor version control and lack of evidence are also reasons for non-enforcement.



## Commonly Litigated Clauses

Businesses most commonly sought to enforce arbitration clauses in 2022, making up 82% of clauses litigated in online-agreement cases versus 77% in 2021. Lagging far behind were Forum Selection clauses, at 8% of cases – notably, a significant decrease from the year before (16%) – followed by general consent to the allegedly offensive conduct the business engaged in, at 5%.

- ARBITRATION
- FORUM SELECTION
- CONSENT

10

# *Defending* Clickwrap in Court

As we've noted in previous reports, courts typically consider three types of evidence when deciding whether to enforce clickwrap agreements:

· Sworn testimony (Affidavits/declarations/live testimony under oath)

· Screenshots of the user interface at the time of acceptance

· Back-end records of acceptance



In the past, back-end records were the ticket to enforcing online terms, because the records proved almost definitively that a user accepted a company's terms, when the user accepted the terms, and what version of the company's terms were live at the time of acceptance.

While back-end records remain a strong piece of evidence to present, very few of the companies trying to enforce their terms in court produced back-end records as evidence of contract acceptance. Producing robust back-end records is challenging to do for companies unless they have a well-built homegrown solution or outsource this work to a third party.

Because the enforceability of online terms often hinges on whether the user at issue was on notice of the terms, screenshots are one of the most important pieces of evidence a company can bring to the table. In fact, the court in Zachman v. Hudson Valley Federal Credit Union declined to decide whether to enforce Hudson Valley's terms because Hudson Valley failed to provide screenshot evidence of what the screen looked like.[16] The court remanded the case back to the lower court and instructed Hudson Valley to produce screenshots demonstrating the content and design of the screen.

Sworn testimony remains crucial for companies trying to enforce their terms in court, but it can be costly. Assembling a declaration or an affidavit requires taking key stakeholders at the organization away from their day-to-day work to prepare a statement detailing the contract acceptance process. Preparing and showing up for an in person court appearance takes even more time and money.

Most companies relied on either a combination of sworn testimony with screenshots of what the screen looked like at the time of signing (37%) or a combination of all three types of evidence (23%). Few companies relied on sworn testimony alone (13%), and even fewer relied on screenshots alone (3%).

[16] *Zachman v. Hudson Valley Fed. Credit Union, 49 F.4th 95 (2d Cir. 2022)*



Evidence Referenced / Cited

- Sworn testimony with screenshots
- Screenshots alone
- Sworn testimony alone
- Combination of all three types of evidence

37%  •  3%  •  13%  •  23%



# Clickwrap *Best Practices* for 2023

Our best practices were developed based on how courts have ruled on clickwrap cases over the years. We keep up to date on clickwrap litigation trends, and our team reads every clickwrap case that comes out. Annually, we update our best practices based on the trends we see.

## Screen Design

Courts tend to favor screens that are optimally designed to put users on notice. The businesses that often have the most success are those that:

- Have a simple and uncluttered screen.
- Use contrasting colors for fonts and background; and ensure font sizes are large enough to be conspicuous.

In addition, when the entire screen is visible at once and the language on the button matches the language of the notice, the courts are more likely to rule in favor of enforceability. And lastly, courts are more critical of companies who pre-check the checkbox.

## Reasonable Notice

Courts are most concerned with whether users are put on reasonable notice that (1) there are terms, and (2) the user is agreeing to them by taking some explicit action. Companies that enforce their terms tend to alert users to the existence of the agreement with specifically clear language.

## Opportunity to Read

In addition to providing users with reasonable notice, courts expect companies to provide users with an opportunity to read the terms prior to agreeing to them.

Common ways companies give users an adequate opportunity to read the agreements include:

- Embedding the terms in a scrollpane directly on the screen
- Requiring users to click the hyperlink to the terms
- Advising users to read the terms prior to checking the box or proceeding through the process
- Making sure the hyperlink to the terms is clickable (do not require users to manually enter the URL into a web browser)
- Formatting hyperlinks to resemble traditional hyperlinks: [blue and underlined](#) (we know your design team is cringing) or making the hyperlinks stand out against the other text in at least two distinct ways

14

## Objective Manifestation of Assent

Another important aspect of creating an enforceable agreement is collecting the user's affirmative assent to the agreement. Courts often rule favorably for companies that:

· Require users to check a box to manifest assent to the terms.
· Require users to agree to terms again after they've been modified.

## Documentation

Courts appreciate when companies are able to provide an audit trail indicating who accepted their online terms, and when. As a result, it is important that a company be able to show who accepted which version of the terms, as well as what the screen looked like when the users encountered the contract acceptance process.



# Clickwrap Best *Use Cases*

Given clickwrap agreements' many advantages, they are leveraged across a number of different use cases. Let's dive into the five that crop up the most often.

## Employee Onboarding

Clickwrap agreements are also increasingly used in employee onboarding processes, especially for remote or distributed teams. They establish employment terms–non-disclosure agreements, confidentiality agreements, non-compete clauses, and intellectual property assignments, to name a few– and streamline the onboarding process and ensure that employees are aware of and accept the terms and conditions of their employment.

## Terms of Service (TOS) and End-User License Agreements (EULA)

Clickwrap agreements set terms and conditions for using websites, mobile apps, and online platforms. TOS and EULA agreements may cover a wide range of topics, including user responsibilities, privacy policies, dispute resolution, and intellectual property rights. They're also leveraged by websites and online platforms to protect their interests and establish binding contractual relationships with users.

## Online Purchases and E-Commerce

When users make purchases online, they are often required to accept clickwrap agreements related to payment terms, refund policies, and shipping and delivery terms. Clickwrap agreements can help e-commerce businesses protect their rights, set expectations with customers, and establish contractual obligations related to the purchase.

## Software License Agreements

Clickwrap agreements often cover the terms and conditions for using software. When users download or install software, they are often required to accept a clickwrap agreement that outlines the terms of the software license. This may include provisions related to usage restrictions, intellectual property rights, and limitations of liability.

## User-Generated Content

Websites, social media platforms, and online communities that allow users to generate and share content also often leverage clickwrap agreements. The agreements may include provisions related to user-generated content, such as intellectual property rights, content moderation policies, and liability limitations and they can help websites and online platforms establish legal rights and responsibilities for user-generated content.

17



# Conclusion

In 2023, the key to successful business is catering to customers on their terms and ensuring smooth transactions. As a result, legal teams must adapt and become proficient in handling online contracts while also mitigating associated risks. Familiarity with clickwrap litigation trends is essential for modern businesses, particularly for legal teams whose primary responsibility is to safeguard the company from negative legal consequences. By adopting industry best practices and use cases, legal teams can effectively position their organizations for online success.



[Sign up for a free custom demo](#) and see what Ironclad Clickwrap can do for your business.

18

# Continue Your *Legal Operations Journey* Via the Ironclad Community

**The world of legal operations is changing incredibly quickly—but we're all in this together.**

Join the Ironclad Community to regularly connect with other innovative, forward-looking legal operations leaders. Share ideas, get advice from others in your shoes, get help filling open roles, and build your personal brand by attending or speaking at online and in-person events.



